## Richmond.

### NEAL & BINFORD v. TAYLOR, RECEIVER.

March 14, 1907.

1. SALES—*Adulteration—Refusal to Accept—Case at Bar.*—The contract set up by the defendants in this suit was for the purchase, of pure, unadulterated ground tonka beans. The evidence shows that all deliveries thereunder were .of the apparently pure article, and were accepted and used under that belief, and that the sellers knew that they were accepted under that belief, but carefully concealed the fact of adulteration from the purchasers. After the assets of the purchasers were placed in the hands of a receiver, he demanded of the sellers of the tonka beans payment of an account for tobacco sold, and they relied upon their right under the contract to pay in the ground tonka beans. The receiver offered to accept the pure beans unground at the contract price, but the sellers declined to deliver them, and tendered ground tonka beans containing thirty-five *per cent.* adulteration, which the receiver declined to accept, and sued for the price of the tobacco which was to be paid for, as aforesaid.

   *Held:* It was not only the right but the duty of the receiver to decline to accept the adulterated article, and its tender was ineffectual. He was in no wise prejudiced by the prior acceptance of the adulterated article under the circumstances above disclosed.

2. APPEAL AND ERROR—*Erroneous Instructions—Harmless Error.*—A verdict will not be set aside by this court because of an erroneous instruction given by the trial court, when the court can see from the whole record that no other verdict could have been found, even under correct instructions, or that the party complaining could not have been prejudiced by the action of the court in giving such instructions.

3. INSTRUCTIONS—*Evidence to Support.*—It is not error to refuse an instruction when there is no evidence in the case to support it.

Error to a judgment of the Circuit Court of the city of Richmond in an action of assumpsit. Judgment for the plaintiff. Defendants assign error.

*Affirmed.*

The opinion states the case.

*Wm. L. Royall,* for the plaintiffs in error.

*Scott & Buchanan,* for the defendant in error.

CARDWELL, J., delivered the opinion of the Court.

In the year 1903 the Commonwealth Tobacco Company was engaged in the manufacture of smoking tobacco at Lynchburg, and Neal & Binford, plaintiffs in error, were dealers in tobacco flavorings at Richmond, Va.   The Tobacco Company had a large lot of damaged smoking tobacco which it desired to dispose of at the best possible advantage, the tobacco having been put up badly, in consequence of which it had been returned to the company from all parts of the country; and in July, 1903, the Tobacco Company opened negotiations with plaintiffs in error by letter, with the view of trading some of this tobacco with them for their ground tonka beans.   The result of this correspondence and of verbal agreements thereafter entered into between their respective representatives was a sale and delivery to plaintiffs in error of 23,687 pounds of this tobacco at eighteen cents per pound, and 19,225 pounds at nineteen cents per pound, the whole amounting to $6,016.41, to be paid for at the option ·of plaintiffs in error in No. 1 ground Angostura tonka beans at eighty cents per pound.   From time to time thereafter, upon ·the orders of the Tobacco Company, deliveries of ground beans were made by plaintiffs in error, aggregating $2,586.75, leaving ·a balance due on account of tobacco received by them of ·$3,431.31.   The orders given to the Tobacco Company for the ·delivery of the ground tonka beans, as was stipulated for in the first contract, which was by correspondence, all called for the pure ground beans, and the deliveries all appeared to be of a perfectly pure article, free from all adulteration, and the fact

of adulteration, if any, seems never to have been suspected by the Tobacco Company.

The Tobacco Company went into the hands of a receiver prior to November, 1904, and ceased to carry on its business. Shortly thereafter, about December 1, 1904, the receiver, Jerome Taylor, defendant in error here, presented to plaintiffs in error an account showing the above-mentioned balance of $3,431.31, due for undelivered ground tonka beans, and demanded payment. To this demand plaintiffs in error then replied that there was a contract between them and the Tobacco Company which provided for the right of payment of the account in. ground tonka beans; that they had purchased the beans neces-- sary for that purpose, but had not as yet ground them, and were then not quite ready to do so. They were thereupon informed that the Tobacco Company had gone out of business; that the receiver neither had any use for the ground beans, nor could he dispose of them in that quantity at that time; that they would be released from the labor and the cost of grinding, and the unground beans would be accepted in satisfaction of the account, the receiver being then ready to do so. They were further advised by the receiver not to grind the beans; that if they did so the ground beans would not be accepted; and it is admitted that at the time this notification was received no part of the beans with which the demands of the receiver were to be met had been ground. Disregarding these notifications plaintiffs in error, on or about February 7, 1905, tendered to the receiver ground beans in payment of the account presented to them for the balance due for tobacco theretofore received, as before· stated, and a sample of the ground beans so tendered was analyzed at the instance of the receiver, when it was found to contain 35 per cent. of adulterants, so disguised as to be only discoverable upon a chemical analysis.

Plaintiffs in error still insisting that they had the right to· discharge the balance due from them to the Tobacco Company in the adulterated ground beans, defendant in error brought:

this action of assumpsit against them, upon an open account, for $3,431.31, the balance alleged to be due the Tobacco Company for certain tobaccos theretofore sold and delivered to plaintiffs in error. To this action the latter pleaded the general issue, with the agreement that anything might be shown thereunder which could be proven under any proper special plea, and any general or special replication thereto.

A general replication having been filed and accounts showing the particulars of the claim sued on, the defendants filed in writing the grounds of the defense. The correctness of the account sued on was not put in issue, nor the right of the receiver to sue for the amount due thereon, the theory of the defense being that the account was payable in ground tonka beans—used as a flavoring in the manufacture of smoking tobacco, in which the Tobacco Company was at the time engaged—at the price of eighty cents per pound (which was the market price of pure ground beans); that when the contract for the purchase of the tobacco was entered into, an *express* agreement was made between the Tobacco Company and the defendants that the ground tonka beans which defendants were to deliver under the several contracts between the parties were to contain other substances which defendants usually put into a pound of ground tonka beans, and that the tonka beans and other substances in them, together weighing a pound, were to be considered and accepted as a pound of ground tonka beans for the purpose of those contracts; and that before the commencement of this action a lawful tender of sufficient ground tonka beans to discharge the amount due under said contracts had been made, each pound of which contained other substances than pure ground tonka beans, but containing no more of other substances than the defendants usually put in a pound of ground tonka beans.

Issue was taken on the allegations of fact set up in the defense—the contention of defendant in error being that before plaintiffs in error had ground the beans the defendant in error had directed them not to do so, and had offered to accept the

unground beans in satisfaction of the account; that no contract had been made for anything but pure ground tonka beans; that so much thereof as had theretofore been delivered to the Tobacco Company had been accepted by it under the belief that the ground beans so accepted were pure; and that the ground beans tendered were not in accordance with the contract, being materially adulterated, and were of no value.

Upon the issues thus made the trial resulted in a verdict and judgment in favor of defendant in error for the amount of the account sued on, and this judgment we are asked to review and reverse because of misdirection of the jury and the refusal of the court to set aside the verdict and grant plaintiffs in error a new trial.

Defendant in error, plaintiff below, asked for and had given to the jury four instructions, to all of which plaintiffs in error then objected, but the objection is mainly urged here as to the fourth instruction.

The whole question in the case is, therefore, as stated by the learned counsel for plaintiffs in error, "whether petitioners (plaintiffs in error) tendered to the plaintiff (defendant in error) what they contracted that they might tender. They tendered adulterated tonka beans. Did the contract permit them to tender adulterated tonka beans, or were they bound to tender ground tonka beans that contained no mixture of any sort?"

The uncontroverted evidence shows that there were three distinct exchanges of tobacco for ground tonka beans—one in August, 1903; another in the September following, and the third in March, 1904. It also clearly appears (in fact is admitted) that all of the transactions were on the same terms, the price of the last lot of tobacco being increased from eighteen to nineteen cents per pound to cover cost of the delivery of the last shipment of tobacco at the city of Richmond, and that the first contract was made wholly by correspondence. This correspondence, put in evidence by plaintiffs in error, began by a

letter from the Tobacco Company to plaintiffs in error, which, after stating that it had a lot of tobacco in an "off" condition, asked plaintiffs in error if they were willing to take it in exchange for ground tonka beans; and after the latter had replied, asking for a sample of the tobacco and saying they would let the Tobacco Company know if they could handle it, and after plaintiffs in error had written acknowledging receipt of the sample, quoting No. 1 Angostura tonka beans ground at eighty cents per pound, and saying they preferred the Tobacco Company should make a price on the different lots of tobacco, the latter wrote to plaintiffs in error on August 1, 1903, as follows: "Replying to yours of recent date, beg to say that we have from two to three thousand pounds of the tobacco in question, all of which has been relabeled under the brand of Maid of Virginia. We will be pleased to sell you this tobacco at twenty-two cents, taking in exchange ground Angostura tonka beans." To this letter plaintiffs in error, by telegram, replied: "Will give you eighteen cents for smoking tobacco. Answer." This offer was on the same day accepted by a telegram, which was confirmed by a cotemporaneous letter from the Tobacco Company to plaintiffs in error as follows: "Confirming our wire of today, we beg to say we will ship you the smoking tobacco at eighteen cents. On receipt of this letter please ship us 200 pounds of best grade Angostura beans. Understand, we want the best article and perfectly pure."

The order contained in this letter for 200 pounds ground Angostura tonka beans was filled by shipment the next day of apparently pure unadulterated ground tonka beans.

There is nothing whatever in the correspondence between the parties, or in the oral testimony as to the subsequent contracts or dealings pursuant thereto, to suggest that the Tobacco Company had knowledge that plaintiffs in error were using adulterants in grinding the tonka beans sold and delivered to the Tobacco Company. It will be observed that the letter closing the initial contract expressly stated that the Tobacco Company was

buying "best grade Angostura beans. Understand, we want the best article and perfectly pure." And this interpretation of the contract was acquiesced in by plaintiffs in error without dissent, and by the shipment of what was apparently perfectly pure ground Angostura tonka beans. In each of the contracts thereafter made it was stipulated that the Tobacco Company was to receive best grade ground Angostura tonka beans, perfectly pure, this being impressed upon plaintiffs in error in the various orders for the delivery of the ground tonka beans; and before the last contract was closed and before the delivery of the tobacco, the price of which is sued for in this action, the Tobacco Company received a circular from plaintiffs in error, in which they said: "We guarantee our goods as absolutely pure and of the finest quality." They had also sent out a price list, one of which was sent to the Tobacco Company, which read in part, "We guarantee our goods as absolutely pure."

Referring to the sample taken from the ground beans tendered by plaintiffs in error to the defendant in error, which, when analyzed was found to contain thirty-five *per cent.* of barytes and exhausted ginger, both of which are adulterants, pure and simple, and not a "dryer," Neal, of the firm of Neal & Binford (plaintiffs in error), on cross-examination was asked the following questions and gave the following answers:

"Q. I ask you if you tell the jury that under that letter of August 3d you sent Commonwealth Tobacco Company an article adulterated as the sample that you show us?" "A. I certainly did. I haven't got anything else."

"Q. Now I understand you to state that you sent them an article that was not perfectly pure, without telling them a word about it?" "A. I sent them an article that I usually grind as best goods, and they accepted it and used it up."

"Q. That is undoubtedly true—they accepted it; but the point I made was, so that there may be no misunderstanding

about it, that you sent them an adulterated article?" "A. I don't call it an adulteration."

"Q. An article with this mixture in it?" "A. I did."

"Q. Without telling them anything about it?" "A. Certainly. You don't suppose I am going to tell my business to everybody; I am selling my goods."

"Q. You did not tell Mr. West at that time that the tonka beans you had been giving him was not pure?" "A. I am not fool enough to tell anybody that my stuff is not exactly pure, no more than I would tell state secrets. You would not do it either. Am I bound to answer those questions?"

After this witness had admitted that in filling the orders given him from time to time for delivery of the ground beans he had filled them with the same adulterated article that he filled the first order with he was asked: "And you didn't then tell them that there was any adulteration in it?" "A. No, sir."

"Q. And they had no reason to suspect as far as you know?" "A. No, sir."

By a juror: "Q. They had no knowledge, as far as you know, that there was anything used in the tonka beans other than tonka beans?" "A. No."

The witness was also asked: "When a sample of ground tonka beans is handed you can you tell whether it is adulterated or unadulterated?" "A. No, sir; I can tell whether it is pretty good, strong tonka beans, but you can't tell whether it has any foreign substance in it. You can put it under a microscope and try it."

It is not controverted that the chemical analysis of the sample of ground tonka beans tendered defendant in error showed that it contained 35 *per cent.* of barytes and exhausted ginger, articles of little value for any purpose, and of no value as a mixture with ground Angostura tonka beans, the presence of the adulterants being concealed by the addition of a coloring matter known as turmeric.

R. J. Snead, manager and vice-president of the Tobacco Com-

pany, examined as a witness for defendant in error, after stating that there was in the correspondence or in what was said in the personal interviews with either Neal or Binford nothing to lead him to believe or suspect that the former were delivering the Tobacco Company anything but pure, unadulterated ground tonka beans, was asked: "If you had known at any time that you were getting anything but the pure article, would you have received it?" "A. I would have rejected it."

By a juror: "Does the trade recognize that tonka beans is adulterated?" "A. Never heard of it in my life. In ordering the pure article you have no right to suppose it is adulterated unless there is some statement made to that effect. That is my idea in buying goods."

This witness and also Neal testify that the tobacco trade understood that on account of the oil in tonka beans they cannot be ground for commercial purposes without a "dryer," but it was for the jury to say from all the evidence in the case, under proper instructions, whether or not the Tobacco Company, as well as plaintiffs in error, understood that the ground beans the company were going to get were to contain adulterants of the character and to the extent found in the article tendered the receiver of the Tobacco Company. The evidence tended to show that the "dryer," spoken of as necessary in grinding tonka beans on account of the oil in them, was a very different thing from an adulterant, and did not affect their commercial value when ground with the use only of a "dryer."

It is needless to pursue this review of the evidence further. Suffice it to say that if in the further examination of it the rule requiring that it be considered from the standpoint of a demurrer to evidence be disregarded no other conclusion could be reached than that the original contract between plaintiffs in error and the Tobacco Company was for pure, unadulterated ground tonka beans; that all deliveries thereunder were of the apparently pure article, were accepted and used under the belief that they were such, and would not have been accepted or

used had the truth been known. It is also perfectly clear that plaintiffs in error knew all along that the ground beans delivered by them were accepted under the belief that they were pure; that they carefully concealed the fact of adulteration, because they also knew that the shipment would not be received if this fact were disclosed.

The theory upon which plaintiffs in error made defense to this action, viz: that under a contract for the sale and delivery of pure unadulterated ground Angostura tonka beans, worth on the market eighty cents per pound, the account sued on was payable in a mixture of ground tonka beans with adulterants of no value as flavoring to smoking tobacco, the purpose for which the Tobacco Company agreed to buy the tonka beans, the stuff tendered containing thirty-five *per cent.* of the adulterant and only sixty-five *per cent.* of pure Angostura tonka beans, finds no sanction either in law or reason. Pursuant to this most remarkable theory as to their rights plaintiffs in error had already put off on the Tobacco Company over 1,100 pounds of barytes and exhausted ginger, costing ten cents a pound, as pure tonka beans, admittedly worth eighty cents a pound, and by a continued concealment of the "business secret" by which this fraud was perpetrated upon the Tobacco Company were endeavoring to put off on its receiver, as pure, 4,289½ pounds of a mixture containing thirty-five *per cent.,* or 1,500 pounds of gross adulterants, the presence of which, if known, would have impaired if it had not destroyed the market value of the article tendered.

Eliminating all elements of fraud from the transaction the receiver, on becoming aware of the facts, not only had a clear right to stop the grinding of the tonka beans and to refuse them when ground, but it was plainly his duty to do so. If plaintiffs in error were dealing fairly in carrying out their contracts with the Tobacco Company it was a benefit and not a loss to them to be relieved of the labor and expense of grinding the tonka beans.

Instructions 1, 2 and 3, given for defendant in error, were to the effect that the receiver (defendant in error) of the Tobacco Company stood in its shoes; that in the correspondence put in evidence the Tobacco Company contracted for pure, unadulterated tonka beans, and it was the duty of Neal & Binford (plaintiffs in error) to deliver thereunder ground tonka beans without any other substances if they could be ground without such adulteration; that if the ground beans delivered were materially adulterated, then it was the duty of Neal & Binford to disclose the existence of such adulteration, unless the same was known to the Tobacco Company; that in the absence of this knowledge neither the said company nor its receiver could be prejudiced by reason of the acceptance of the adulterated article; and that if the jury believed from the evidence that the tobacco embraced in the account sued on was delivered by the Tobacco Company with the understanding on its part that it was to be paid for in pure, unadulterated ,ground tonka beans, and that Neal & Binford knew at the time that such was the understanding on the part of the company, and that the beans could be ground without mixing them with foreign substances, then Neal & Binford had no right to pay, or tender in payment, for the tobacco ground beans containing a foreign substance to a material extent.

In view of the evidence these instructions not only give a correct statement of the law applicable to the case, but are eminently fair to plaintiffs in error, guarding every defense that the evidence tended to show them entitled to.

Conceding that the effect of instruction No. 4 was, as is contended, to tell the jury "that as the Tobacco Company had passed into the hands of a receiver, who could make no use of ground tonka beans, he had the right to notify the defendants not to grind the beans up, but to deliver them to him unground, whether they were grinding them pure or adulterated, and that it thereupon became the duty of the defendants to desist from grinding the beans and to deliver them to the plain-

tiff unground," and that this was not a correct statement of the law, we are of opinion that under the circumstances disclosed by the evidence, which have already been stated, there could have been no other verdict than that rendered by the jury regardless of the correctness of this instruction.

It is well settled that if the court can see from the whole record that under correct instructions a different verdict could not have been rightly found, or that the party complaining could not have been prejudiced by the action of the court in giving or refusing instructions, it will not for such reason reverse the judgment and set aside the verdict. *Moore* v. *B. & O. R. Co.,* 103 Va. 189, 48 S. E. 887, and authorities cited.

The court below refused to instruct the jury, at the instance of plaintiffs in error, to the effect that if the Tobacco Company when it agreed to receive the ground beans for its tobacco expected them to contain as much adulteration as those tendered, then their verdict should be for the defendants; and this ruling of the court is assigned as error. With reference to this assignment of error it is only necessary to say that there is no evidence whatever to be found in the record which would have justified the giving of the instruction.

Upon the whole case we are of opinion that the judgment of the Circuit Court is right, and it is, therefore, affirmed.

*Affirmed.*